**LIBERTARIAN PARTY OF NEBRASKA; an unincorporated voluntary association; Daniel Salem, an individual; Barbara Flick, an individual; and Beverley Starkey, an individual, Plaintiffs,**

v.

**Allen BEERMANN, Secretary of State of the State of Nebraska; and Paul L. Douglas, Attorney General of the State of Nebraska, Defendants.**

Civ. No. 84–L–451.

United States District Court, D. Nebraska.

Aug. 31, 1984.

Lavern R. Holdeman, Nelson, Morris & Holdeman, Lincoln, Neb., for plaintiffs.

Terry R. Schaaf, Asst. Atty. Gen., Lincoln, Neb., for defendants.

## OPINION

VAN PELT, Senior District Judge.

The plaintiffs, the Libertarian Party of Nebraska, an unincorporated voluntary association and three individuals to wit: Daniel Salem, Barbara Flick, and Beverley Starkey, all residents of Douglas County, Nebraska, brought this action in the United States District Court for the District of Nebraska against Allen Beermann, Secretary of State, and Paul L. Douglas, Attorney General. The Secretary of State in Nebraska is responsible for the conduct of state elections, including the certification of parties and candidates for a position on the general election ballot. Jurisdiction is claimed under 28 U.S.C. Section 1331(a); 28 U.S.C. Section 1391(b); 28 U.S.C. Sections 1651, 2201, 2202; 42 U.S.C. Sections 1983, 1988.

Plaintiffs sought to enjoin defendants from enforcing Subsections (1), (3), and (8) of Nebr.Rev.Stat., Section 32–526 (1982 Cum.Supp.), which pertain to the formation of new political parties by petition, alleging violations of their First and Fourteenth Amendment rights to freedom of speech and association and due process under color of state law. This suit was instituted three weeks before the state statutory deadline of August 1, 1984, for submitting petitions to place a new political party upon the general election ballot. The hearing in this case was held July 26, 1984. An Order was entered July 30, 1984 (see filing 10).

The parties stipulated and the Court finds that the following facts are uncontested. The relevant portions of Nebr.Rev. Stat., Section 32–526 (1982 Cum.Supp.)[1]

---

**1.** All further references to the Nebraska Statute are to Section 32–526 as found in the 1982 Cum.Supp.

reads as follows, with the contested language underscored:

32–526. New political party; formation; procedure; violations; penalty.

(1) In order to form a new political party there shall be presented to the Secretary of State petitions containing signatures totaling not less than one per cent of the total votes cast for the office of Governor at the most recent general election for such office. The signatures of registered electors on such petitions must be so distributed as to include qualified registered electors totaling at least one per cent of the votes cast for Governor in the most recent gubernatorial election in each of at least one-fifth of the counties in this state.... If the new political party desires to be established and have ballot position for the general election and not in the primary of that year, such petitions must be filed with the Secretary of State on or before August 1 of that year.... The form of the petition for the formation of a new party shall be substantially as follows:

### FORMATION OF A NEW POLITICAL PARTY

The object of this petition is to form a new political party in the State of Nebraska to be known as _____.

To the Honorable _____, Secretary of State for the State of Nebraska:

We, the undersigned qualified and registered voters of the State of Nebraska, and the county of _____, being severally qualified to sign this petition, respectfully request that the above named new political party be formed in the State of Nebraska, and each for himself or herself says: I have personally signed this petition on the date opposite my name; I am a qualified voter of the State of Nebraska, and county of _____, and am qualified to sign this petition; my city, village, or post-office address, and my street and street number or voting precinct, are correctly written after my name.

Further, we the undersigned hereby pledge to support the new party, support its candidates and to change our registration to affiliate with such new party.

.    .    .    .    .

(3) Every circulator of a petition shall be, not less than the constitutionally prescribed age of an elector, and a resident, and registered voter of the State of Nebraska and of the county wherein the petitioners reside.

.    .    .    .    .

(8) Any person signing any name other than his or her own to any petition or knowingly signing his or her name more than once, or who is not, at the time of signing or circulating the same, a legal voter and qualified to sign or circulate the same, or any person who shall falsely swear to any signature upon any such petition, or any officer or person willfully violating any provision of this section, shall be guilty of a Class V misdemeanor.

In the 1982 gubernatorial election. 547,902 legal voters cast ballots for the office of governor. The Court finds a minimum of one percent of this number is 5480. Therefore, to comply with the statute, 5480 names must be collected to place a new party on the ballot.

Nebraska now has, and has had for some time in the past, 93 counties legally formed and acting as such. Thus, circulating in and filing of petitions from one-fifth of 93 counties as provided in N.R.S. Section 32–526(1) requires that petitions be obtained from not less than 19 counties.

It was further agreed between attorneys for the parties that in the event any injunctive relief was granted to plaintiffs, to which the defendants do not consent by the stipulation, that defendants would have 20 days after August 1, 1984, to wit: to and including August 20, 1984, to place the name of plaintiff Libertarian Party of Nebraska on the ballot in Nebraska to be used at the November 6, 1984, general election with the same force and effect as though the plaintiffs had submitted their complet-

ed petitions on or before August 1, 1984. The Court approved this agreement.

Plaintiffs allege that the portion of Section 32–526(1) which requires signatures equalling one percent of the electors voting in the previous gubernatorial race in each of at least 19 counties is a violation of the "one man, one vote" principle. It is claimed that this section unconstitutionally infringes upon their freedom of speech and association under the First Amendment. The portion of subsection (1), Section 32–526 which requires petitioners to support the new party, support its candidates, and to change their registration to affiliate with the new party is also claimed to be an unconstitutional infringement of their rights of free speech and association. Plaintiffs further allege that subsection (3) of Section 32–526 requiring that petition circulators be residents and registered voters of the State of Nebraska and of the county wherein they are circulating petitions unduly burdens their efforts to form a new political party and, as a result, is also an unconstitutional restriction on the exercise of their First and Fourteenth Amendment Rights.

Defendants claim that such requirements are necessary to advance legitimate State interests in protecting the integrity and efficiency of the electoral system and, as such, are valid and constitutional exercises of the State's power.

By reason of the nature of the matter and the stipulations of the parties, the Court concluded that an Order should be entered immediately after due consideration of the arguments presented at the hearing. Such Order was entered July 30, 1984. In this Order, the Court reserved the right to file a Memorandum or Opinion which would constitute its Findings of Fact and Conclusions of Law as soon as was reasonably possible, with the same effect as though filed prior to or as part of the Order.

Upon consideration of the facts and arguments presented in this case, the Court finds that part of Section 32–526(1) which requires signatures equal to the one percent of the persons voting in the 1982 gubernatorial race to be distributed among at least 19 counties to be unconstitutional and void as a violation of the "one man, one vote" principle. It also finds that portion of Section 32–526(1) which requires signers of petitions for the formation of new parties to pledge to support the party, support its candidates, and to change their registration to affiliate with the petitioning party is unconstitutional and void as an invasion of privacy, to freedom of choice and the right to cast a secret ballot. The Court further finds that N.R.S. Section 32–526(3) requiring petition circulators to be registered voters and residents of the state and county in which they are circulating petitions is a valid exercise of the state's power to protect its compelling interest in maintaining the integrity of the election process by preventing fraud and misrepresentation among petition circulators.

In this case, plaintiff, Libertarian Party of Nebraska, was requesting a temporary restraining order or a preliminary injunction. The criteria to be considered before such an order or injunction is issued are set forth by the Court of Appeals of the Eighth Circuit in *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109 (8th Cir.1981).

> Whether a preliminary injunction should issue involves consideration of (1) the threat or irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest. *Id.* at 114.

There can be little argument about the importance of the issues involved here. "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Williams v. Rhodes*, 393 U.S. 23, 31, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968), quoting *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S.Ct. 526,

534, 11 L.Ed.2d 481 (1964). Competition in ideas and governmental policies is at the core of the electoral process and of the First Amendment freedoms. The right to form a party for the advancement of political goals, means little if a party is denied an equal opportunity to win votes or if the right to vote is heavily burdened by restricting the elector's choice to one or two parties when other parties are clamoring for a place on the ballot. State laws governing access to the ballot either as independent candidates or via the formation of a new political party place burdens on two overlapping rights: the right of qualified voters, regardless of their political persuasion, to cast their votes effectively, and the right of individuals to associate for the advancement of their political beliefs. These rights are protected from infringement by the states by the First and Fourteenth Amendments. *Williams* 393 U.S. at 30–31, 89 S.Ct. at 10.

█ Because these are fundamental rights, States must demonstrate a compelling interest which is addressed by the statute in question. *Williams* at 31, 89 S.Ct. at 10; *Storer v. Brown,* 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974); *McLain v. Meier,* 637 F.2d 1159 (8th Cir.1980); *MacBride v. Exon,* 558 F.2d 443 (8th Cir. 1977). Among state interests which have been recognized are maintaining the integrity of the political process by preventing party fragmentation and interparty raiding, *Rosario v. Rockefeller,* 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973); assuring that candidates have some significant backing from the community thus reducing voter confusion as a result of overcrowding ballots or clogging the election machinery; and the prevention of frivolous and/or fraudulent candidacies. *Jenness v. Fortson,* 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971); *Bullock v. Carter,* 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972); *Storer* 415 U.S. at 732, 94 S.Ct. at 1280; *Clements v. Fashing,* 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982). However, "[t]his legitimate state interest ... must be achieved by a means that does not unfairly or unnecessarily burden either a minor party's or an individual candidate's equally important interest in the continued availability of political opportunity." *Lubin v. Panish,* 415 U.S. 709, 716, 94 S.Ct. 1315, 1320, 39 L.Ed.2d 702 (1974).

In applying the *Dataphase* criteria, it would probably go without saying that where fundamental rights of association and speech are involved, public interest is inextricably present also. Politics probably occupies more media coverage time than any other activity except sports. There is also little debate of an irreparable injury. Once persons are injured by infringement or burdens upon their constitutional rights, they cannot be restored to their original condition and can only be protected from further damage in the future.

█ Thus, whether or not an injunction should issue involves consideration of whether the movant will succeed on the merits. There is no "litmus paper" test as pointed out in *Anderson v. Celebrezze, Jr.,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). It is necessary to (1) analyze the character and magnitude of injury to the asserted rights the plaintiff seeks to vindicate and, (2) identify and evaluate the precise interest put forward by the State as justification for the burden imposed by its rule and the extent to which those interests make it necessary to burden the plaintiff's rights. *Id.* at 789, 103 S.Ct. at 1570.

The Court in its Order, filing 10, has found that the language of Section 32–526(1) which requires a new political party to file petitions containing signatures of at least one percent of the persons voting in the most recent gubernatorial election in each of at least one-fifth (19) of the counties in the state is an unconstitutional violation of equal representation and the "one man, one vote" principle. The Court further found in its Order that that portion of Section 32–526(1) which requires petition signatures from 19 counties in an amount totaling not less than one percent of the vote in the last gubernatorial election from each county, is also unconstitutional and void.

In reaching its decision, the Court is influenced by a line of cases founded upon the United States Supreme Court decisions set forth in *Moore v. Ogilvie*, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969), and extended in *Illinois Elections Board v. Socialist Workers Party*, 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979). *Moore* dealt with an Illinois law which required an independent candidate to submit petitions containing 25,000 signatures, including 200 signatures from each of 50 of 102 counties. Ninety-three percent of the voting population resided in 49 counties, while 6.6 percent resided in the other 53 counties.

The Supreme Court ruled the state law unconstitutional. "This law discriminates against the residents of the populous counties of the state in favor of the rural sections. It, therefore, lacks the equality to which the exercise of political rights is entitled under the Fourteenth Amendment." *Moore* 394 U.S. at 819, 89 S.Ct. at 1496. In *Illinois Elections Board v. Socialist Workers Party*, the Supreme Court struck down another Illinois statute which distinguished between the number of signatures required for formation of a new party with candidates in statewide elections as opposed to purely local elections. The result was that it took more signatures for a candidate to gain ballot position in Chicago than for a similar place on a state ballot.

*Moore* was cited and followed in *Socialist Labor Party v. Rhodes*, 318 F.Supp. 1262 (SD Ohio, 1970). In Ohio, two-thirds of the voting population lived in 16 counties, 50 percent of the total population lived in seven counties. The state law required a petition candidate to obtain seven percent of the vote case in the prior gubernatorial race, including 200 signatures from 30 out of 80 counties. The Court ruled these requirements were too restrictive, and noted that the 30 county distribution resulted in the dilution of the voting strength of the urban counties.

Federal Courts do recognize the state's needs to eliminate frivolous candidates and splintering of political parties by assuring that independent candidates and new parties have some degree of statewide support. District and Circuit Courts generally uphold a requirement for a percentage of either total state electors or a percentage of electors in each congressional district where the voting population is evenly distributed among the districts. *See: American Party of Texas v. White*, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974); *Arutunoff v. Oklahoma State Election Board*, 687 F.2d 1375 (10th Cir.1982); *Libertarian Party of Florida v. State of Florida*, 710 F.2d 790 (11th Cir.1983); *Hudler v. Austin*, 419 F.Supp. 1002 (ED Mich.1976); *Udall v. Bowen*, 419 F.Supp. 746 (SD Ind.1976). Cases which apparently do not follow this pattern can be explained or distinguished. Before *McCarthy v. Garrahy*, 460 F.Supp. 1042 (D RI 1978), Rhode Island required a minimum 25 signatures from each of the state's five counties to place an independent candidate on the ballot.

When figured on a percentage basis, 25 votes represented .09 percent of the voters in Bristol County, but only .008 percent of the voters in Providence County, and thus the voters in Bristol County had ten times the power of a voter in Providence County. It was on the basis of this analysis that the Court ruled that the statute resulted in an unconstitutional dilution of the "one man, one vote" principle, and in doing so was in actuality following the majority case line.

Low statewide population was a significant factor in *McLain v. Meier*, 637 F.2d 1159 (8th Cir.1980) in which the North Dakota statutory requirements were held to be so oppressive as to discourage the formation of new parties. Plaintiffs demonstrated great difficulty in meeting the requirements while the State made no showing of a compelling need for stringent measures.

In *Zautra v. Miller*, 348 F.Supp. 847 (CD Utah, 1972) the Court upheld a Utah statute requiring 10 signatures from 10 counties out of a total of 500 signatures needed for a new political association to place a candidate on the ballot. The Utah District Court placed the burden on the plaintiffs by saying plaintiffs had not shown any

"real and significant" impact on the exercise of their franchise.

It appears to this Court that the most equitable means of assuring that the petitioning candidate or party demonstrates the necessary evidence of statewide support without unduly burdening such party would be to require that the petitions be signed by a percent of the voters in each congressional district. Congressional districts must be nearly equal in voting population. This would avoid a rural-urban split such as could easily arise in Nebraska if the number of names on a petition were based upon a flat one percent of the electors voting in the last gubernatorial race. In this situation, for instance, the petitioning party could obtain all of the necessary names in Omaha and Lincoln, thus ignoring residents in Western Nebraska altogether, just the opposite result of the present unconstitutional requirement of a percentage of names from 19 counties where rural residents could overrule the desire of residents in the more populated counties.

A requirement that signatures be distributed among congressional districts rather than counties avoids what could be an extremely heavy burden on petitioners should a percent of electors voting for governor from *every* county be required.

As above noted, plaintiffs objected to the statutory requirement that persons signing the petition for new party formation must pledge to (a) support the candidate, (b) support the party, and (c) change their registration to affiliate with the new party. N.R.S. 32–526(1). They argued that requiring thousands of voters to make a commitment to join and support the party is unrealistic and oppressive. The Court found that the provision of Section 32–526(1) requiring that the signers of the petition must "pledge to support the new party, support its candidates, and to change [their] registration to affiliate with such new party," is an unlawful and unconstitutional invasion of privacy and of the secret ballot.

The right to a secret ballot has been recognized as one of the fundamental civil liberties in our democracy, despite the fact that the Constitution does not specifically guarantee such a right. This principle safeguards the honesty of the election process by lessening or eliminating violence, intimidation, bribery and other corrupt practices. A requirement that a person publically pledge to support a candidate or party and change his affiliation to do so operates to discourage citizens from participation in the election process simply because they do not wish others to know how they will vote. The Nebraska pledge requirement is stronger than the Kentucky statute which required that petitioners, by signing, "desired to vote" for the candidate. This statute was declared unconstitutional in *Anderson v. Mills*, 664 F.2d 600 (6th Cir.1981), as a direct and unacceptable abridgement of the right to a secret ballot.

It is only those electors wishing to sign a petition who must declare their desire to vote for a specific individual. Electors who support other candidates have to make no such public declaration. The chilling effect that such a practice has an associational and voting rights is obvious. The voting citizen must decide whether to sign the petition, having his political preference clearly and unmistakably disclosed, or to refrain from signing. A potential subscriber, who is uncertain about whom he will support in the general election, but with an interest in the candidate, will be unable to sign the petition because of the requisite declaration. *Id.* at 609.

In addition, many voters have no desire to change basic political affiliations, but neither do they vote a straight political ticket in the general elections. Such voters as these would be discouraged from signing the petitions for third parties by the requirement to change their political affiliation. Where enough such voters are kept from signing, all voters are diminished in their freedom of choice. Many voters in the general elections do not make their final decisions until very near or at the actual time of voting. As recognized in the

cases dealing with deadlines for submitting petitions for independent or new party candidates, "most voters in fact look to third party alternatives only when they have become dissatisfied with the platforms and candidates put forward by the established political parties." *McLain v. Meier*, 637 F.2d 1159, 1163 (8th Cir.1980). As previously mentioned, competition in ideas and governmental policies is the core of the electoral process. Third parties have contributed creative political philosophies in the past. No doubt they will do so in the future. States do have a compelling interest in controlling fragmentation which, if too great, can paralyze the entire political system above and beyond the mere mechanics of balloting. States also have a compelling interest in assuring that new parties have some reasonable distribution of support and that the new party is sincere in its efforts to organize successfully. However, the burdens placed upon the fundamental rights to ballot access, expressed by the "one man, one vote" principle and secret ballot must be only those burdens necessary to achieve the goal and no more. Those burdens must be the result of the least restrictive means. "The measures adopted by a state may not go beyond what the state's compelling interests actually require, and broad and stringent restrictions or requirements cannot stand where more moderate ones would do as well." *MacBride* at 448.

Nebraska's statutory wording may be less restrictive than South Dakota's requirement that the voter, in signing a petition for a new party, states that the signer intends to affiliate with that party and, in effect, had so affiliated for the purpose of forming the party, which was declared unconstitutional in *Libertarian Party of South Dakota v. Kundert*, 579 F.Supp. 735 (D SD 1984). It is much less restrictive than the North Carolina statute declared unconstitutional in *North Carolina Socialist Worker's Party v. North Carolina State Board of Elections*, 538 F.Supp. 864 (ED NC 1982) in which by the act of signing the petition, signers directed the county board of elections to change their party affiliation to the new party immediately following its certification. Nevertheless, the Nebraska statute is too restrictive and the burden it places on an individual's freedom to choose privately and to express his choice privately by means of the secret ballot is unacceptable as a result.

Plaintiffs' third point of complaint was the requirement that petition circulators must be registered voters of the state and residents and registered voters of the county in which they are circulating petitions. *See* 32–526(3). Plaintiffs contend that requiring persons soliciting petition signatures to be residents and registered voters of the county in which they are circulating petitions severely limits solicitation in public areas such as shopping malls or the state fair where large numbers of persons are easily approached and forces the petition drive to relative immobility. Both cases upon which plaintiffs rely, *West Virginia Libertarian Party v. Manchin*, 270 SE.2d 634 (W.VA 1980), and *The Coalition for Political Honesty v. Illinois State Board of Elections*, No. 81 C 2718 (ND Ill. April 23, 1982) (Unreported), can be distinguished from the situation in Nebraska. The magisterial districts in West Virginia were very small subdivisions of the state's counties. In ruling West Virginia's statute unconstitutional, the Supreme Court of Appeals recognized the difficulties attendant upon restricting circulators to the district in which they were residents and registered voters, (*West Virginia Libertarian Party* at 640–642). However, West Virginia also required that petition circulators be certified by state officials and receive identification cards prior to the circulation drive. This provision was upheld as a means of controlling fraud and misrepresentation in the solicitation process. *Id.* at 642–643. In the unreported Illinois case, some of the election districts were state-formed counties and some were subdivisions of counties, the boundaries of which were unclear even to election officials. The Court, in removing the election district residency requirement, did uphold the provision which

required petition circulators to be registered voters of the state.

"The requirement that circulators be registered voters appears to be the only procedure available to the state which might protect against the type of fraud described above [bogus solicitors misrepresenting themselves to reduce or damage competing parties].... [T]he Ccurt is not convinced that the registration requirement is at all burdensome or that it infringes in any way the right to petition." *The Coalition for Political Honesty* at 19.

Since there is no provision for certification of solicitors in Nebraska, the requirement that petition circulators be registered voters of the State serves a compelling state interest to prevent misrepresentation and fraud by either the prospective new party or its political opponents. While Nebraska goes somewhat further in requiring solicitors to remain within county boundaries, this is not a prohibitive burden on petitioners. Even the court in West Virginia distinguished between the very small magisterial districts and the state's counties. All Nebraska voters can be expected to know the county in which they reside and short questioning by the solicitor would suffice to determine the potential signer's county of residence. Since the formation of a new party, by necessity, entails a large amount of time and effort, recruitment of a nucleus of supporters in counties in which petitions are being circulated serves to demonstrate both the seriousness of the party organizers and the distribution of support for the party ideals.

The Court finds, therefore, that there is a compelling state interest to prevent misrepresentation and fraud. It is reasonable that petition circulators as described in Section 32–526(3) be registered voters of the State of Nebraska and residents and registered voters in the county in which they are circulating petitions. It follows that each such provision is a valid requirement. The Court finds that the state has a legitimate reason for the requirement that the circulators be registered voters in the State of Nebraska in that residents should have a

familiarity with, and the ability to ascertain by questions or otherwise, and to determine, whether the persons signing such a petition are or are not residents of such county.